FOR PUBLICATION

**DISTRICT COURT OF THE VIRGIN ISLANDS
DIVISION OF ST. THOMAS AND ST. JOHN
APPELLATE DIVISION**

| | | |
|---|---|---|
| RENELL LETTSOME | ) | |
| | ) | |
| *Appellant,* | ) | |
| | ) | |
| v. | ) | D.C. Crim. App. No. 2006-68 |
| | ) | |
| PEOPLE OF THE VIRGIN ISLANDS | ) | |
| | ) | |
| *Appellee.* | ) | |

On Appeal from the Superior Court of the Virgin Islands,
the Honorable Brenda J. Hollar presiding

Considered: March 5, 2010
Filed: August 21, 2015

BEFORE: **CURTIS V. GÓMEZ**, Chief Judge of the District Court of the
Virgin Islands; **RAYMOND FINCH**, Judge of the District Court of the
Virgin Islands; and **HAROLD W.L. WILLOCKS**, Judge of the Superior
Court, Division of St. Croix, sitting by designation.

ATTORNEYS:

**Pedro K. Williams, Esq.**
St. Thomas, U.S.V.I.
          *For the Appellant.*

**Dolace McLean, AAG**
St. Thomas, U.S.V.I.
          *For the Appellee.*

**MEMORANDUM OPINION**

*Lettsome v. People*
Crim. App. No. 2006-68
Memorandum Opinion
Page 2

**PER CURIAM,**

Appellant Renell Lettsome ("Lettsome") appeals his convictions

in the Superior Court. For the reasons stated below, the Court will

affirm Lettsome's convictions in part and reverse in part.

## I.   FACTUAL AND PROCEDURAL BACKGROUND

### A.   The Murder and Assault

David Geiger ("Geiger") lived with his son Nathan at a house

in St. John, United States Virgin Islands in 2005. Geiger's property

on St. John also contained several separate apartments that were

occupied by other tenants during that time.

Geiger left St. John from October 20, 2005 through October 25,

2005. During that time Amber Taylor ("Taylor") house-sat for Geiger.

While Geiger was off-island, $50,000 was stolen from the house. Upon

his return, Geiger discovered that the money was missing and

confronted Taylor about it. Taylor denied any involvement in the

theft.

While at home on October 29, 2005, David Geiger was stabbed and

beaten to death. His fourteen year old son, Nathan Geiger, was

severely injured. The Geiger home was also set on fire.

Nathan Geiger was rescued from the blaze by two tenants of David

Geiger's. The tenants were alerted to the fire by several honks of

a car horn. (J.A. 641.) They found Nathan Geiger lying unconscious

on the living room floor and managed to rescue him. The tenants were

*Lettsome v. People*
Crim. App. No. 2006-68
Memorandum Opinion
Page 3

unable to rescue David Geiger, whose body was later found partially

covered by a burnt out mattress. (J.A. 646.)

## B.   Taylor's Statement and Relocation to Florida

On October 31, 2005, the police took a statement from Taylor,

in which she denied any involvement in the theft of $50,000 from

Geiger. Taylor also denied involvement in Geiger's murder. On

November 11, 2005, Taylor gave another statement. In that second

statement, Taylor asserted that, on the night of the robbery, she

opened the door to Geiger's house to a man named Tulius Stewart

("Stewart"). She claimed that Stewart overpowered her and stole

Geiger's money. (J.A. 221.) Taylor then told the police that an

individual named Renell Lettsome ("Lettsome") killed Geiger. Taylor

stated that she and Lettsome were on St. Thomas on October 28, 2005.

On the night of October 29, 2005, she and Lettsome had a fight. (J.A.

205.)

Sometime after Taylor made her statement, the People assisted

Taylor in relocating to Florida, on the ground that her safety was

at risk and she was neither charged with a crime nor subpoenaed as

a witness in any case. Florida is beyond the ninety-mile radius of

the subpoena power of the Superior Court of the Virgin Islands.

## C.   Lettsome's Confession and Prosecution

On Sunday November 27, 2005, Lettsome walked into the Road Town

police station in Tortola, British Virgin Islands ("BVI"). (J.A.

743.) Lettsome walked over to the guard desk where police constable

*Lettsome v. People*
Crim. App. No. 2006-68
Memorandum Opinion
Page 4

Clyde Farrington ("Farrington") was seated. Lettsome pointed to a photo of himself in the local newspaper indicating that he was wanted by United States authorities in connection with the murder of David Geiger and the assault on Nathan Geiger.

Farrington then called Detective Donna Monsanto ("Monsanto") of the Criminal Investigative Unit and informed her of Lettsome's presence. Detective Monsanto came to the lobby of the police station and asked Lettsome if she could be of assistance. Lettsome replied, "I saw my picture in the newspaper saying the police looking for me and I came to turn myself in." (J.A. 749.) Lettsome explained that while he did kill David Geiger, "it didn't happen the way the papers have it." (J.A. 750.)

Monsanto escorted Lettsome to an office where Lettsome was informed that there was a warrant for his arrest issued in the United States Virgin Islands. Monsanto asked Lettsome for identification. Lettsome responded that he did not have any identification because he had stolen a dingy in St. John and fled from there to Tortola. Monsanto then told Lettsome that it was an offense to enter the BVI without immigration clearance and proceeded to arrest Lettsome on suspicion of illegal entry to the BVI. (J.A. 752.)

After Lettsome was arrested, Monsanto told him that she intended to take a statement from him. She gave Lettsome the opportunity to write his own statement or to give a verbal statement and have someone

*Lettsome v. People*
Crim. App. No. 2006-68
Memorandum Opinion
Page 5

else write the statement. (J.A. 752.) Lettsome elected to give a
verbal statement.

At that point, Detective Monsanto gave Lettsome what is known
as a "Caution Statement." Under the law of the United Kingdom, upon
arrest an arrestee must be given a written statement stating: that
the arrestee has "a right to have someone informed of their arrest";
that the arrestee has "a right to consult privately with a solicitor
and that free independent legal advice is available"; and that the
arrestee has the right to consult the Code of Practice for the
Detention, Treatment, and Questioning of Persons by Police Officers.
Police and Criminal Evidence Act, 1984, c. 60, Code C, § 3.2. The
notice must also set forth "the arrangements for obtaining legal
advice" and must inform the arrestee of "the right to a copy of the
custody record." *Id.* Lastly, the notice must include the "caution."
*Id.* The caution must be in the following terms: "You do not have to
say anything. But it may harm your defence if you do not mention when
questioned something which you later rely on in Court. Anything you
do say may be given in evidence." *Id.* at § 10.5.

Lettsome read the caution statement and indicated that he
understood the warning. He signed the Caution Statement in the
presence of Monsanto, with Farrington as witness to his signature.
Lettsome then gave a statement, which was transcribed. Lettsome
reviewed the statement and was given an opportunity to correct,

*Lettsome v. People*
Crim. App. No. 2006-68
Memorandum Opinion
Page 6

alter, or add anything. Lettsome declined to do so. Lettsome then signed the transcription of his statement. (J.A. 754.)

While giving his statement, Lettsome admitted that he had not been eating or sleeping well for a number of days. Lettsome expressed concern for the safety of his family, and explained that he decided to turn in himself because he was tired of running. (J.A. 765-66.)

Monsanto would later describe Lettsome as being very "assistive" in giving his statement, even sharing with Monsanto additional facts not included in Lettsome's official statement. (J.A. 764.) According to the un-transcribed statements that he made to Monsanto, Lettsome was dating Taylor who worked for someone named "David." Lettsome told Monsanto that David accused Taylor of stealing $50,000. Lettsome believed that another man, known to him as "Tulius," had stolen the money. (J.A. 775.) Lettsome offered to repay David, but David continued to harass and accuse Taylor. In apparent retaliation, Lettsome came to David's house on the evening of October 29, 2005. (J.A. 778.) There, the two had an altercation, culminating in Lettsome striking David with a metal pipe and then stabbing David with a knife by a window in the kitchen of David's house. (J.A. 777.) Lettsome also mentioned that he knew David was dead and so he lit a fire. After lighting the fire, Lettsome got into his car and honked the horn in an attempt to alert the other occupants of David's house about the fire. (J.A. 777.)

*Lettsome v. People*
Crim. App. No. 2006-68
Memorandum Opinion
Page 7

Shortly after Lettsome made his statement to Monsanto, three police officers from the Virgin Islands Police Department (the "VIPD") arrived in the BVI. The VIPD officers entered the room where Lettsome was sitting and mirandized him by asking Lettsome to read a written *Miranda* warning. The VIPD officers then asked Lettsome if he understood his rights and asked Lettsome if he agreed to waive those rights. (J.A. 798.) Lettsome said that he both understood and waived his rights, and signed the warning form. (J.A. 798.)

Lettsome then told the VIPD officers that he killed Geiger. Lettsome stated that, on the night Geiger was killed, he waited outside the Geiger house for almost four hours. (J.A. 840.) After the Geigers went to bed, Lettsome said that he entered the house with a heavy metal pipe that he planned to use to kill David. (J.A. 841.) On his way to Geiger's bedroom, Lettsome got a kitchen knife. Lettsome entered Geigers's bedroom, awoke Geiger, and a struggle  ensued. Ultimately, Lettsome said that he stabbed Geiger with the knife, grabbed ahold of Geiger's neck and covered Geiger's mouth. Geiger then bit Lettsome.

Lettsome stated that, at that point, Nathan Geiger walked sleepily into his father's room, apparently awakened by the altercation. Lettsome let go of David Geiger and pushed Nathan Geiger into the kitchen, where he beat him unconscious with the metal pipe. Lettsome then moved Nathan's body to the living room. While in the living room, Lettsome drank from a gallon bottle of water, leaving

*Lettsome v. People*
Crim. App. No. 2006-68
Memorandum Opinion
Page 8

bloody fingerprints on the bottle. Lettsome then tried to clean up the house so there would be no evidence of his presence. During that clean-up attempt, he heard David Geiger moan from the bedroom. Lettsome went back into the bedroom with the heavy metal pipe and started to beat Geiger until he was dead. Lettsome touched his head and realized that some of his dreadlocks were missing. Reasoning that he would be unable to locate the missing locks of hair, Lettsome decided to get some torch fluid from the nearby golf course and burn down Geiger's house to destroy any evidence of his crime. Lettsome left the house and went in search of an accelerant. When he found some, he returned and doused the house with it. He then threw a mattress on top of David's body and set the house on fire.

Lettsome then told the VIPD officers, much as he had told Monsanto, that he knew there were other residents in Geiger's house, so he blew the horn on Geiger's jeep several times to alert them to the fire.

On November 30, 2005, after Lettsome gave his statement, he was brought to the United States Virgin Islands. Once on United States soil, Lettsome was arrested and transported to the police department. (J.A. 814.) Again, Lettsome was advised of his rights. Again, Lettsome waived those rights. During this questioning, Lettsome got upset with the police officers because they had started to ask questions about Taylor and the theft of the $50,000, as well as about Jerome Potter, Lettsome's uncle. (J.A. 222.) Lettsome told the police

*Lettsome v. People*
Crim. App. No. 2006-68
Memorandum Opinion
Page 9

that he had already admitted to the killing of David and was not going to answer questions about a robbery or anything relating to his family.

Lettsome was charged in a Twelve-Count Information. Count One charged first degree murder, in violation of V.I. CODE ANN. tit. 14, § 921, 922(a)(1). Count Two charged use of a dangerous weapon during the commission of first degree murder, in violation of V.I. CODE ANN. tit. 14, § 2251(a)(2)(B). Count Three charged second degree murder, in violation of V.I. CODE ANN. tit. 14, § 921, 922(b). Count Four charged use of a dangerous weapon during the commission of second degree murder, in violation of V.I. CODE ANN. tit. 14, § 2251(a)(2)(B). Count Five charged attempted first degree murder, in violation of V.I. CODE ANN. tit. 14, § 921, 922(a)(1), 331(1). Count Six charged use of a dangerous weapon during an attempted first degree murder, in violation of V.I. CODE ANN. tit. 14, § 2251(a)(2)(B). Count Seven charged first degree assault, in violation of V.I. CODE ANN. tit. 14, § 295(1). Count Eight charged use of a dangerous weapon during the commission of first degree assault, in violation of V.I. CODE ANN. tit. 14, § 2251(a)(2)(B). Count Nine charged assault in the third degree, in violation of V.I. CODE ANN. tit. 14, § 297(2). Count Ten charged use of a dangerous weapon during the commission of third degree assault, in violation of V.I. CODE ANN. tit. 14, § 2251(a)(2)(B). Count Eleven charged first degree arson, in violation of V.I. CODE ANN. tit. 14, § 252(a). Count Twelve charged use of a dangerous weapon during

*Lettsome v. People*
Crim. App. No. 2006-68
Memorandum Opinion
Page 10

the commission of first degree arson, in violation of V.I. CODE ANN.

tit. 14, § 2251(a)(2)(B).

Two weeks before the trial was to commence, Lettsome became

aware that blood found on specimens taken from the scene of the crime

had been analyzed and determined to be a match for Lettsome.

(Appellant's Br. 14.) After becoming aware of the match, Lettsome

filed two motions: a motion to retain a DNA expert and a motion for

continuance of the trial so that his DNA expert could review the

report. The court granted the motion to retain an expert but denied

the motion to continue.

A trial in this matter commenced before a jury on August 7, 2006.

During the course of the trial, in lieu of her live testimony,

Taylor's two statements were read to the jury. (J.A. 579-86.) At the

conclusion of the trial, the jury returned a verdict of guilty as

to Counts Three, Four, Nine, Ten, Eleven, and Twelve. As to Count

Five, the jury returned a verdict of guilty of the lesser included

offense attempted second degree murder. As to Count Six, the jury

returned a verdict of guilty of the lesser included offense of

unauthorized use of a dangerous weapon during the commission of

attempted second degree murder. As to Counts One, Two, Seven, and

Eight the jury returned a verdict of not guilty.

Thereafter, the Superior Court sentenced Lettsome to a term of

incarceration of twenty-five years as to Count Three, fifteen years

as to Count Four, two and a half years as to Count Five, fifteen years

*Lettsome v. People*
Crim. App. No. 2006-68
Memorandum Opinion
Page 11

as to Count Six, five years as to Count Nine, fifteen years as to

Count Ten, twenty years with ten years suspended as to Count Eleven,

and seven and a half years as to Count Twelve. The trial court also

assessed a fine of $10,000 as to each of Counts Four, Six, Ten, and

Twelve. The trial court ordered the terms of Counts Three, Four, Five,

and Six to run consecutively, with the terms of Counts Eleven and

Twelve to run concurrently, for an aggregate term of incarceration

of fifty-seven and a half years. The court ordered the fines assessed

as to Counts Four and Six to run concurrently, for an aggregate fine

of $20,000.

On appeal, Lettsome raises six issues: (1) that the Superior

Court erred in denying his motion for a continuance of the trial date;

(2) that the People committed misconduct in helping Taylor relocate

to Florida; (3) that the unavailability of Taylor violated Lettsome's

Sixth Amendment right of confrontation; (4) that the People presented

insufficient evidence to support his convictions; (5) that the

Superior Court erred in permitting the People to amend the

Information; and (6) that the Superior Court imposed an excessive

sentence.

## II.  DISCUSSION

### A.    Jurisdiction

The Court has jurisdiction to review criminal judgments and

orders of the Superior Court in cases in which the defendant has been

convicted, and has not entered a guilty plea. *See* V.I. CODE ANN. tit.

*Lettsome v. People*
Crim. App. No. 2006-68
Memorandum Opinion
Page 12

4, § 33 (2006); Revised Organic Act of 1984, 28 U.S.C. § 1613(a)

(2006).

**B.  Standards of Review**

   **1.  Denial of Motion to Continue**

   A trial court's decision to deny a continuance will only be

reversed if an abuse of discretion is shown. *United States v.*

*Kikumura*, 947 F.2d 72, 80 (3d Cir. 1991).

   **2.  Constitutional Claims**

   Our review of constitutional claims is plenary. *See, e.g.,*

*United States v. Dees*, 467 F.3d 847, 854 (3d Cir. 2006). However,

where the constitutional claim arises from a charge of prosecutorial

misconduct, "[o]ur analysis proceeds in two stages. First, we must

determine whether [the prosecutor] committed misconduct." *United*

*States v. Liburd*, 607 F.3d 339, 343 (3d Cir. 2010). Only if the

prosecutor committed misconduct must we "consider the

[constitutional] implications of that misconduct." *Id.*

   **3.  Sufficiency of the Evidence**

   In reviewing the sufficiency of the evidence to support a

conviction, a trial court's judgment will be sustained if, viewing

the evidence in the light most favorable to the government, a

reasonable trier of fact could find the defendant guilty beyond a

reasonable doubt of every element of the offense. *See Georges v.*

*Government of the Virgin Islands*, 119 F. Supp. 2d 514, 523 (D.V.I.

App. Div. 2000), aff'd, 265 F.3d 1055 (3d Cir. 2001). We may overturn

*Lettsome v. People*
Crim. App. No. 2006-68
Memorandum Opinion
Page 13

a conviction "only when the record contains no evidence, regardless

of how it is weighted, from which the [trier of fact] could find guilt

beyond a reasonable doubt." *United States v. Anderson*, 108 F.3d 478,

481 (3d Cir. 1997) (*quoting United States v. McNeill*, 887 F.2d 448,

450 (3d Cir. 1989)).

### 4. Amendment to Information

When reviewing an amendment to an information under Fed. R.

Crim. P. 7(e), we determine whether an error occurred and whether

that error was harmless. *Simon v. Gov't of the Virgin Islands*, 47

V.I. 3 (V.I. Terr. Ct. 2002).

### 5. Excessiveness of Sentence

We review a criminal sentence for reasonableness, *Gall v. United

States*, 552 U.S. 38, 51 (2007), which generally involves two levels

of inquiry. We begin by determining whether the Superior Court

committed any "significant procedural error, such as . . . failing

to consider the § 3553(a) factors." *Id.* at 51. Upon satisfying

ourselves that a sentence is "procedurally sound," we then ask

whether the sentence is substantively reasonable. *Id.* "The

abuse-of-discretion standard applies to both our procedural and

substantive reasonableness inquiries." *United States v. Tomko*, 562

F.3d 558, 567 (3d. Cir. 2009).

*Lettsome v. People*
Crim. App. No. 2006-68
Memorandum Opinion
Page 14

### III. ANALYSIS

### A.   Denial of Continuance

Lettsome contends that the Superior Court's denial of his
pretrial motion to continue was clearly erroneous and an abuse of
discretion that prevented him from obtaining any meaningful benefit
that a DNA expert could have provided.

The denial of a motion for continuance is within the discretion
of the trial court. *United States v. Kikumura*, 947 F.2d 72 (3d Cir.
1991). "[D]enying a request for a continuance constitutes an abuse
of discretion only when it is 'so arbitrary as to violate due
process.'" *Id.* at 78. Factors to consider in determining whether a
trial court abuses its discretion in denying motion for continuance
include: (1) the efficient administration of criminal justice; (2)
the rights of the accused, including an adequate opportunity to
prepare a defense; (3) the rights of other defendants awaiting trial
who may be prejudiced by a continuance; and (4) the diligence of
counsel in requesting the continuance. *See United States v. Mark*,
460 F. App'x 103, 106-7 (3d Cir. 2012); *United States v. Fisher*, 10
F.3d 115, 117 (3d. Cir. 1993); *United States v. Cruz-Jiminez*, 977
F.2d 95, 104 n.13 (3d Cir. 1992); *Kikumura*, 947 F.2d at 78 (quoting
*United States v. Fischbach and Moore, Inc.*, 750 F.2d 1183, 1195 (3d
Cir.1984)).

In *United States v. Mark*, 460 F. App'x 103 (3d Cir. 2012),
defendant Gelean Mark requested a ninety day continuance of his trial

*Lettsome v. People*
Crim. App. No. 2006-68
Memorandum Opinion
Page 15

date. *Mark*, 460 F. App'x at 106-7. Defendant Mark was one of a number

of defendants in a complex racketeering case, and sought the

additional time to make full use of thousands of pages of discovery,

prior trial transcripts, and numerous recordings. *Id.* The district

court declined to grant a full ninety day continuance, and instead

continued the trial for forty-two days. *Id.* Following his trial and

conviction, Mark appealed the district court's denial of the full

continuance sought. *Id.*

The Court of Appeals for the Third Circuit affirmed. The Third

Circuit noted that it "give[s] a judge 'wide latitude' in exercising

discretion over the grant of a continuance" but that such discretion

"must balance the conflicting demands of court administration with

the rights of the accused and third parties who would be affected

by the consequences of a delay." *Id.* The Third Circuit acknowledged

that Mark's trial preparation was complicated and that, in fact, it

had no quarrels with Mark's proffered justifications for seeking a

continuance. *Id.* That said, the Third Circuit concluded that the

denial of the motion to continue was not an abuse of discretion. *Id.*

The Third Circuit noted that "[t]he time allotted for trial

preparation is often less than counsel may desire[.]" *Id.* The Third

Circuit, however, was not controlled by counsel's desire for more

time, and found that where the defendant had a total of eighty-seven

days to prepare a defense and that there had been no sudden

*Lettsome v. People*
Crim. App. No. 2006-68
Memorandum Opinion
Page 16

emergencies frustrating the defendant's preparation, the time Mark

received was sufficient. *Id.*

Here, Lettsome argues that he was denied an adequate opportunity

to present a defense because the trial court denied his motion to

continue. However, the August 7, 2006, trial date was set in May of

2006, after the People requested a continuance because DNA analysis

of the blood specimens could not be completed until late July. This

should have put Lettsome on notice that DNA analysis might be an issue

more than two months before the trial date. Moreover, the People

previously informed Lettsome's counsel that FBI analysis was being

performed on DNA samples as early as March 24, 2006, when counsel

discussed these and other discovery issues at a pretrial conference.

(J.A. 11.)

Lettsome received the DNA report on July 24, 2006, two weeks

prior to trial. Despite having knowledge of the DNA testing since

March, and despite receiving the report two weeks before the trial,

Lettsome did not file a motion to retain a DNA expert and a motion

to continue until July 31, 2006, a full week after the report was

received. Lettsome has offered no explanation for his failure to

retain an expert sooner.

Further, Lettsome has not explained how, if at all, his defense

was prejudiced by the lack of a DNA expert. In his brief, he simply

asserts in a conclusory manner that such an expert would have

"assist[ed] Defendant/Appellant in preparing for that aspect of the

case." (Appellant's Br. 15.) Even assuming that Lettsome may have
been able to present a stronger defense if a continuance had been
granted, his counsel did not exercise the appropriate diligence in
retaining an expert or moving to continue. Lettsome was aware, for
as much as four months prior to trial, that DNA analysis might be
an issue. Lettsome has not explained why he did not retain an expert
earlier, or even why it would have been impossible to retain an expert
after July 31, 2006, asserting simply that "It was clear that
Defendant/Appellant could not retain a DNA expert between July 24,
2006 and August 4, 2006." (Appellant's Br. 15.) Thus, considering
that Lettsome was on notice some four months prior to trial that DNA
might be at issue and Lettsome's total failure in either requesting
a continuance sooner or searching for an expert during that time,
we cannot say that the trial court abused its discretion in denying
Lettsome's motion to continue. *See United States v. Cook*, 531 F. App'x
584, 586-87 (6th Cir. 2013)(affirming  trial court where the trial
court denied a continuance based on defendant's stated need to retain
an expert where there was no record evidence of actual prejudice or
that any defense expert would be unable to prepare in time).

**B.   Prosecutorial Misconduct**

Lettsome argues that the assistance provided by the government
to Taylor in moving to Florida constituted prosecutorial misconduct.
He argues that, but for the government assisting Taylor with her

*Lettsome v. People*
Crim. App. No. 2006-68
Memorandum Opinion
Page 18

relocation, he would have been able to present a defense that his

confession was fabricated to remove suspicion from Taylor.

"Due process guarantees that a criminal defendant will be

treated with 'that fundamental fairness essential to the very concept

of justice. In order to declare a denial of it, [the Court] must find

that the absence of that fairness fatally infected the trial; the

acts complained of must be of such quality as necessarily prevents

a fair trial." *United States v. Valenzuela-Bernal*, 458 U.S. 858, 872

(1982) (quoting *Lisenba v. California*, 314 U.S. 219, 236 (1941)).

The "touchstone of due process analysis in cases of alleged

prosecutorial misconduct is the fairness of the trial, not the

culpability of the prosecutor." *Smith v. Phillips*, 455 U.S. 209, 219

(1982) (finding that the prosecutor's failure to disclose that a

juror had applied to work as an investigator in the district

attorney's office did not deprive the defendant of a fair trial).

"[T]he aim of due process 'is not punishment of society for the

misdeeds of the prosecutor but avoidance of an unfair trial to the

accused.' " *Id.* (quoting *Brady v. Maryland*, 373 U.S. 83, 87 (1963)).

The Court of Appeals for the Third Circuit has stated that

"[i]ntimidation or threats from the government that dissuade a

potential witness from testifying may infringe a

defendant's . . . right to due process and Sixth Amendment right to

compulsory process." *Lambert v. Blackwell*, 387 F.3d 210, 260 (3d Cir.

2004). "In order to violate the Constitution, the government's

conduct must have 'substantially interfered' with a [witness's]
choice to testify." *Id*. "Whether substantial interference occurred
is a factual determination." *Id*.

Should a court find that there was substantial interference,
the court must then inquire as to whether the error was harmless.
In doing so, the Third Circuit requires us to consider the materiality
of the witness's testimony and the bad faith of the prosecution. *See*
*United States v. Santini*, 963 F.2d 585, 596 (3d Cir. 1992) ("[E]ven
when actions by the prosecution appear to deprive a criminal
defendant of his constitutional right to present a defense, no remedy
will lie for such infringement absent a showing that the government
has caused the unavailability of material evidence and has done so
in bad faith."); *see also United States v. Emeugbunam*, 268 F.3d 377,
400 (6th Cir. 2001) ("[G]overnmental conduct must amount to a
substantial interference with a witness's free and unhampered
determination to testify before we will find a violation of due
process or the Sixth Amendment. Even when such interference occurs,
a violation of a defendant's right to call witnesses in his defense
is subject to harmless error analysis." (citation omitted)); *United*
*States v. Foster*, 128 F.3d 949, 953 (6th Cir. 1997) ("[E]ven if a
defendant is able to prove prosecutorial misconduct amounting to
substantial interference with a witness, that misconduct will not
result in a new trial if it can be said to be harmless."); *United*
*States v. Anderson*, No. 93-7490, 1994 WL 24961, at *2 (5th Cir. 1994)

*Lettsome v. People*
Crim. App. No. 2006-68
Memorandum Opinion
Page 20

(noting that the rule of *per se* prejudice when the government

interferes with a defense witness has been "modified" and that "[t]o

prevail on such a [due process] claim, the defendant now must show

how she was prejudiced by the interference"); *United States v.*

*Saunders*, 943 F.2d 388, 392 (4th Cir. 1991) ("When a defendant is

able to establish a substantial government interference, the inquiry

moves to the question of whether it was prejudicial or harmless

error.")

In *Lambert v. Blackwell*, 387 F.3d 210 (3d Cir. 2004), the Third

Circuit considered whether a prosecutor's pretrial contact with an

expert witness for the defense violated the defendant's rights to

due process and compulsory process. The expert witness was under

contract with the local county. *Id.* at 261. The prosecutor felt that,

as a result of this contract, he would be unable to discredit the

expert witness at trial. *Id.* The prosecutor contacted the expert,

even though defense counsel did not consent, and expressed his

concern. *Id.* The expert offered to withdraw if the trial court found

that his contract precluded him from acting as an expert for the

defense. *Id.* The prosecutor ultimately told the expert not to

withdraw as it would only cause a continuance. *Id.* When this was

revealed to the trial court, the following colloquy took place:

> THE COURT: You've done your examination and you have your
> opinions that you are going to state as part of this case,
> I take it.
>
> [THE EXPERT]: Yes. I have a consultative letter.

*Lettsome v. People*
Crim. App. No. 2006-68
Memorandum Opinion
Page 21

. . . .

THE COURT: All right. And I take it that your testimony would be consistent with that consultative letter.

[THE EXPERT]: I would hope so, yes.

THE COURT: Okay. Is there anything about the discussion you had with [the prosecutor] that causes you to not say what was in that letter?

[THE EXPERT]: No, I don't believe so.

THE COURT: Did you feel threatened or intimidated or coerced by that discussion you had with [the prosecutor]?

[THE EXPERT]: No, sir, I did not.

THE COURT: Okay.

. . . [Defense counsel], are you aware of any rule of professional conduct that prevents an attorney in a criminal case from contacting an expert or a witness who would testify for the other side?

[DEFENSE COUNSEL]: No, I'm not.

THE COURT: Are you aware of any such rule?

[THE PROSECUTOR]: I'm not aware of a rule.

THE COURT: I'm not aware of any such rule. Okay. Based upon my review of the motion for sanctions before today and before our hearing, this date, and based upon the discussion we've had here on the record in chambers, and the candid and frank comments of [the expert witness, defense counsel, and the prosecutor], I'm going to deny the motion for sanctions.

*Id.* The Third Circuit noted that it did not believe the prosecutor's

"contact with [the expert witness] was entirely appropriate" and that

"[a]t the very least, [the prosecutor] displayed a lack of judgment."

*Id.* at 264. However, the Third Circuit held that, on the record before

*Lettsome v. People*
Crim. App. No. 2006-68
Memorandum Opinion
Page 22

it, the prosecutor's contact did not rise to the levels of substantial

interference. *Id*.

In this case, Lettsome was unable to compel Taylor's attendance

at trial because she had moved to Florida, which was beyond the reach

of the subpoena powers of the Superior Court. The People stipulated

that they purchased plane tickets for Taylor and her children to

travel from the Virgin Islands to Florida, that they paid for Taylor

and her children to stay in a hotel in Florida for several nights,

and that Taylor had not been charged with any crime. (J.A. 580-86.)

At trial, VIPD Detective Delbert Phipps further testified that, at

the time of the trial, the whereabouts of Taylor were unknown to the

Government of the Virgin Islands. (J.A. 867.) The People contend that

they assisted Taylor in relocating because she claimed to have been

threatened by Lettsome's uncle. (J.A. 216.)

Given Taylor's intimate involvement in this case, the People's

assistance with her relocation, when based solely on an

uninvestigated and unsubstantiated perception of a threat, was very

likely improper. The People have never articulated any reason for

why relocation was the only means of ensuring Taylor's safety, or

why it was necessary to relocate Taylor all the way to Florida, or

why it was necessary for the government to pay for the costs of this

relocation. Moreover, throughout the course of the trial, the People

insisted that they had done nothing wrong, made no effort to locate

Taylor, and repeatedly opposed efforts by the trial court to craft

*Lettsome v. People*
Crim. App. No. 2006-68
Memorandum Opinion
Page 23

a stipulation explaining to the jury why Taylor was not available to testify. (*See* J.A. 580-86.) This presents a strong case that Taylor was relocated by the People in bad faith.

However, there is no evidence that the People coerced, intimidated, or otherwise prevented Taylor from making a "free and unhampered decision to testify . . . ." *Emeugbunam*, 268 F.3d at 400. Unlike *Lambert*, there is no suggestion that the People attempted to discourage Taylor from testifying. The People also did not conceal the fact that Taylor had been relocated, and disclosed to where she had been relocated. Even assuming that arranging for Taylor to testify at the trial would not be simple, Lettsome has not articulated any reason why the People's relocation of her made it impossible for him to depose her or obtain her testimony in another way, as defendants must commonly do with foreign or out-of-state witnesses.

Further, even assuming there was substantial interference, any error was harmless. The evidence adduced at trial consisted of abundant forensic evidence which placed Lettsome at the scene of the crime. In addition, the People offered Lettsome's two confessions, in which he described in detail how he committed the crimes. Given the overwhelming evidence of Lettsome's guilt, we cannot say that Lettsome was prejudiced by his inability to call Taylor as a witness.

C.   **Admission of Taylor's Statement**

Lettsome further argues that the admission of Taylor's statement in which she accused Lettsome of committing the crime at

*Lettsome v. People*
Crim. App. No. 2006-68
Memorandum Opinion
Page 24

issue violated his Sixth Amendment right of confrontation.

A literal reading of the Confrontation Clause suggests that it codifies a procedural protection: in every criminal trial, a defendant has the right to "confront[ ]," meaning (among other things) to cross-examine, each witness who testifies against her or him. U.S. CONST. AMEND. VI. However, during the twentieth century, the Supreme Court reframed Sixth Amendment jurisprudence in terms of what it perceived to be the ultimate goal of the Sixth Amendment: ensuring reliable outcomes at trial. In *Ohio v. Roberts*, 448 U.S. 56 (1980), the Court held that cross-examination is not the only constitutionally acceptable means to guarantee the reliability of evidence offered at trial. *Id.* at 65-66. *Roberts* involved allegations of forgery. *Id.* at 58. The defendant argued that the victim's daughter had allowed him to use her parents' credit cards and checkbook. *Id.* The daughter denied this allegation during a preliminary examination, during which she was not subject to cross-examination. *Id.* Before trial, without any evidence of foul play by either the prosecution or the defense, the witness moved to another state and ceased all contact with her family and the defendant. *Id.* At trial, in lieu of her testimony, the prosecution introduced the transcript of the preliminary examination in accordance with an Ohio statute that permitted the admission of preliminary-examination transcripts when witnesses were unavailable. *Id.* at 59. The Supreme Court upheld the admission of the transcript by interpreting the Confrontation

*Lettsome v. People*
Crim. App. No. 2006-68
Memorandum Opinion
Page 25

Clause narrowly, in light of "its underlying purpose to augment

accuracy in the factfinding process," to permit the admission of

uncross-examined testimony--or, to use the Court's Sixth Amendment

jargon, unconfronted testimony--when it "bears adequate indicia of

reliability." *Id.* at 65-66. The Court thus interpreted the

Confrontation Clause as a substantive guarantee of the underlying

goal of cross-examination--ensuring reliable testimony--rather than

as a right to that procedure itself.

Shortly thereafter, in *Delaware v. Van Arsdall*, 475 U.S. 673

(1986), the Supreme Court held that all Confrontation Clause

violations were subject to harmless error review. The Supreme Court

relied on its decision in *Roberts* in reaching this holding, finding

that the Confrontation Clause merely gave defendants the " 'right

of effective cross-examination" ' and accordingly a new trial was

warranted only when defendants were so unable to exercise their right

of cross examination that substantial prejudice resulted. *Id.* at 682.

The Court stressed that the core inquiry was simply whether the

admission of evidence without proper cross-examination affected the

reliability of the fact-finding process. *Id.* at 684.

The Supreme Court reversed *Roberts* with its decision in *Crawford

v. Washington*, 541 U.S. 36, 53-54 (2004). The Supreme Courts holding

in *Crawford* is perhaps most notable for its straightforwardness:

"Where testimonial statements are at issue, the only indicium of

reliability sufficient to satisfy constitutional demands is the one

*Lettsome v. People*
Crim. App. No. 2006-68
Memorandum Opinion
Page 26

the Constitution actually prescribes: confrontation." *Id.* at 68-69.

Although the Court has had some difficult providing a precise

definition of the neologism "testimonial," *see, e.g., Davis v.*

*Washington*, 547 U.S. 813, 822 (2006), it is abundantly clear that,

should an out-of-court statement prove to be testimonial, it is

inadmissible unless the witness is unavailable and the defendant was

given a prior opportunity to conduct cross-examination. *Crawford,*

541 U.S. at 69.

Since *Crawford*, the Supreme Court has declined to follow *Van*

*Arsdall*. The Supreme Court has on one occasion compared violations

of the right of confrontation with a structural defect--an error so

grave prejudice is presumed:

> Since, it was argued, the purpose of the Confrontation
> Clause was to ensure the reliability of evidence, so long
> as the testimonial hearsay bore indicia of reliability,
> the Confrontation Clause was not violated. We rejected
> that argument . . . in Crawford . . . saying that the
> Confrontation Clause commands, not that evidence be
> reliable, but that reliability be assessed in a particular
> manner: by testing in the crucible of cross-examination.
>
> So also with the Sixth Amendment right to counsel of
> choice. It commands, not that a trial be fair, but that
> a particular guarantee of fairness be provided . . . .

*United States v. Gonzalez-Lopez*, 548 U.S. 140, 146 (2006) (internal

citations and quotation marks omitted). The Court went on to hold

that the denial of the right to counsel of choice was a structural

defect because it "def[ied] analysis by harmless-error standards."

*Id.* at 148.

*Lettsome v. People*
Crim. App. No. 2006-68
Memorandum Opinion
Page 27

By contrast, virtually every United States Court of Appeal, including the Third Circuit, has continued to abide by *Van Arsdall* and subject Confrontation Clause violations to harmless error review. *See, e.g., United States v. Jimenez*, 513 F.3d 62, 77-79 (3d Cir. 2008); *Albrech v. Horn*, 485 F.3d 103, 134-36 (3d Cir. 2007); *Bobadilla v. Carlson*, 575 F.3d 882, 887 (8th Cir. 2009) *United States v. Anson*, 304 F. App'x 1, 5 (2d Cir. 2008); *Hawkins v. Ganshimer*, 286 F. App'x 896, 904-05 (6th Cir. 2008); *United States v. Earle*, 488 F.3d 537, 545-46 (1st Cir. 2007); *United States v. Banks*, 482 F.3d 733, 741-42 (4th Cir. 2007); *United States v. Larson*, 495 F.3d 1094, 1107-08 (9th Cir. 2007); *United States v. Zheng Xao Yi*, 460 F.3d 623, 634-45 (5th Cir. 2006); *Grossman v. McDonough*, 466 F.3d 1225, 1338-39 (11th Cir. 2006); *United States v. Summers*, 414 F.3d 1287, 1303-04 (10th Cir. 2005); *United States v. Gilbert*, 391 F.3d 882, 887 (7th Cir. 2004). This trend is troubling because several of these and other post-*Crawford* decisions base the harmless error analysis on precisely the sort of judicial reliability assessments *Crawford* found to be anathema to the American system of adversarial criminal justice.

In *United States v. Jimenez*, 513 F.3d 62 (3d Cir. 2008), the Court of Appeals for the Third Circuit upheld the defendants' bank-fraud convictions, obtained in part through the admission of several bank statements as business records, despite the defendants having no opportunity to cross-examine the custodian of records. *Id.*

*Lettsome v. People*
Crim. App. No. 2006-68
Memorandum Opinion
Page 28

at 77-79. The court noted that the written declarations of the records

custodian stated that the bank statements were created at or near

the time that the matters contained in the statements occurred, that

the statements were made and kept in the course of the regularly

conducted activities of the bank, and that any duplicates were

accurate copies of the originals. *Id.* at 78. The court repeatedly

stressed that the defendants never challenged the accuracy of these

declarations. *Id.* at 78-79. The admission of the statements thus

appears to have been predicated on their reliability, as determined

by the Third Circuit, rather than on the extent to which the

defendants had prior opportunity to cross-examine the custodian.

Similarly, the Court of Appeals for the Fifth Circuit held that

the admission of a codefendant's incriminating extrajudicial

confession was harmless error, in part because the defendant had an

opportunity to cross-examine another witness "whose testimony

corroborated [the] confession." *Miller v. Dretke*, 404 F.3d 908, 918

(5th Cir. 2005). In another case, the Fifth Circuit held that

admissions of out-of-court statements by an alleged accomplice were

harmless error because the witness "spoke directly to her own

knowledge" and because the statements were "corroborated by other

evidence." *United States v. Zheng Xiao Yi*, 460 F.3d 623, 634-35 (5th

Cir. 2006). The Court of Appeals for the Sixth Circuit has likewise

held that the admission of a tape-recorded statement by a

nontestifying codefendant was harmless error because of "independent

circumstantial proof" and corroboration from another witness.

*Hawkins v. Ganshimer*, 286 F. App'x 896, 904 (6th Cir. 2008).

Ironically, the Supreme Court in *Crawford* specifically noted that

the Confrontation Clause was "plainly meant to exclude" accomplice

confessions implicating the accused. 541 U.S. at 63-64 (noting also

that even though "it was highly unlikely that accomplice confessions

implicating the accused could survive *Roberts*, courts continue to

routinely admit them." (internal quotation marks omitted))."

Despite this doctrinal inconsistency, *Van Arsdall* remains good

law in this and, apparently, every other Circuit and accordingly we

are bound to apply it to this case.

Here, it cannot be denied that Taylor's second statement was

squarely testimonial, as it directly implicated Lettsome in the

crimes at issue here. *See Davis* 547 U.S. at 822. Taylor made this

statement to a police officer and neither Lettsome nor his counsel

were present or had an opportunity to cross examine her. The admission

of Taylor's statement was plainly erroneous and reflects an appalling

lack of understanding of the Sixth Amendment's Confrontation Clause.

However, as discussed above, there was overwhelming evidence

of Lettsome's guilt. Lettsome was placed at Geiger's house by

abundant forensic evidence, and Lettsome confessed in detail to the

crimes. Thus, despite the egregiousness of the trial court's error,

we must say that it was ultimately harmless.

**D.   Sufficiency of the Evidence**

     **1.   Counts Three and Four: Second Degree Murder and Use of a Dangerous Weapon during the Commission of Second Degree Murder**

Count Three charges Lettsome with the second degree murder of David Geiger, in violation of Title 14, Sections 921 and 922(b) of the Virgin Islands Code. In the Virgin Islands, "[m]urder is the unlawful killing of a human being with malice aforethought." V.I. CODE ANN. tit. 14, § 921. First degree murder consists of all murder that is "willful, deliberate, and premeditated"; all murder committed during the course of a dangerous felony; and all murder committed against a police officer or other public official during the course of their official duties. V.I. CODE ANN. tit. 14, § 922(a). All other murder is second degree murder. *Id.* at § 922(b).

Count Four charges Lettsome with possessing, bearing, transporting, carrying, or otherwise controlling a dangerous weapon during the commission of a crime of violence, in violation of Title 14, Section 2251(a)(2)(B) of the Virgin Islands Code. A dangerous weapon includes a "bludgeon" or a "dangerous knife." V.I. CODE ANN. tit. 14, § 2251(a)(1), (2). A crime of violence "means the crime of, or attempt to commit, murder in any degree, . . . arson, . . . [or] assault in the third degree . . . ." V.I. CODE ANN. tit. 23, § 451(e).

As discussed above, the evidence in support of these charges consisted primarily of forensic evidence, consisting of blood and DNA samples placing Lettsome at the scene, as well as Lettsome's

*Lettsome v. People*
Crim. App. No. 2006-68
Memorandum Opinion
Page 31

confessions. In his confessions, Lettsome admitted that he went to

Geiger's house for the purpose of confronting him. Lettsome further

admitted that he attacked Geiger with a metal pipe, beating him

repeatedly about the head. After attacking Geiger's son and realizing

Geiger was dead, Lettsome covered Geiger's body with a mattress and

set his house on fire.

Lettsome argues that his multiple confessions do not tend to

show his guilt because they are not entirely consistent with the other

evidence. Specifically, Lettsome points out that in his confession

he said that he broke into the Geiger home via the screen door, but

that the Geiger's neighbors also testified that they broke the screen

door. (Appellant's Br. at 34-35.) Lettsome's confessions are also

themselves inconsistent with one another; for example, in his first

confession he stated that he stabbed Geiger with a knife he found

in the kitchen, but in his second confession he stated that his attack

on Geiger was confined to Geiger's bedroom.

When the government's proof includes statements or confessions

from the defendant, those statements must be corroborated to

"establish the trustworthiness of the statement." *Opper v. United*

*States*, 348 U.S. 84, 93 (1954). A statement is properly corroborated

so long as there is sufficient evidence to establish that the

statement, as a whole, is trustworthy. *Virgin Islands v. Harris*, 938

F.2d 401, 409-10 (3d Cir. 1991). Each element of the statement need

not be independently corroborated. *Id.* at 410. The evidence at trial

*Lettsome v. People*
Crim. App. No. 2006-68
Memorandum Opinion
Page 32

must only substantially corroborate the confessions. *United States v. Varela-Garcia*, 87 F. App'x 795, 798-99 (3d Cir. 2004) (affirming convictions where the government had adduced "sufficient circumstantial proof to buttress the appellants' admissions . . . .").

Here, the inconsistencies in Lettsome's confessions are minor compared to the abundance of corroborative, circumstantial proof of his guilt. For example, in both confessions Lettsome stated that after strangling and beating David Geiger to death, he drank from a bottle of water in the living room. That water bottle tested positive for his DNA. (J.A. 1050-52.) Lettsome's description of the attack on Nathan Geiger was consistent with Nathan Geiger's injuries. Lettsome's confessions accurately describe the interior of Geiger's house. (J.A. 1236.) Lastly, Geiger's neighbors described hearing a car horn and then finding Nathan Geiger severely injured and the Geigers' house on fire, just as Lettsome described. Further consistencies include Lettsome's description of his attack Nathan Geiger, including moving Nathan the living room, where he was rescued by neighbors. Indeed, though he had never been in the Geiger house before, was able to describe its layout. This circumstantial proof is more than sufficient to corroborate Lettsome's detailed confessions. Thus, based on this evidence, it was reasonable for the jury to find Lettsome guilty of Counts Three and Four.

        **2.   Counts Five, Six, Nine, and Ten: Attempted Second Degree Murder, Use of a Dangerous Weapon during the Commission of Second Degree Murder, Third Degree Assault, and Use of a Dangerous Weapon during the Commission of Third Degree Assault**

Count Five charges Lettsome with the attempted second degree murder of Nathan Geiger. "The crime of attempt consists of: (1) an intent to do an act or bring about certain consequences which in law would amount to a crime; and (2) an act in furtherance of that attempt which goes beyond mere preparation." *Government of the Virgin Islands v. Albert*, 18 V.I. 21, 24 (D.V.I. 1980) (quoting LaFave & Scott, Criminal Law § 59 at 423). Count Six charges Lettsome with using a dangerous weapon during the attempted commission of second degree murder.

Count Nine charges Lettsome with third degree assault against Nathan Geiger. In the Virgin Islands, assault is either the "attempt[ed] commi[ssion of] a battery" or the "mak[ing of] a threatening gesture showing in itself an immediate intention coupled with an ability to commit a battery . . . ." V.I. Code Ann. tit. 14, § 291 (2012). Assault in the third degree is any assault against another "with intent to commit a felony"; "with a deadly weapon"; "with premeditated design and by use of means calculated to inflict great bodily harm"; which "inflicts seriously bodily injury"; and any assault against a peace officer. V.I. Code Ann. tit. 14, § 297(1)-(5) (2012). Count Ten charges Lettsome with using a dangerous weapon during the commission of this assault.

As discussed above, the evidence adduced at trial in support

of these charges consisted primarily of Lettsome's confessions.
Lettsome stated that when Nathan Geiger stumbled onto Lettsome
attacking David Geiger, Lettsome pushed Nathan Geiger into the
kitchen where he stabbed him with a knife. As a result, Nathan Geiger
was seriously injured. From this evidence, a jury could reasonably
infer that Lettsome intended to kill Nathan Geiger and took a
substantial step towards that end. Further, from this evidence, it
was reasonable for a jury to conclude that Lettsome assaulted Nathan
Geiger with a deadly weapon, and that seriously bodily injury
resulted. Lastly, it was reasonable for the jury to conclude that
both the attempted murder and the assault were committed through the
use of a dangerous weapon, namely, a knife.

### 3. Counts Eleven and Twelve: First Degree Arson and Use of a Dangerous Weapon during the Commission of First Degree Arson

Count Eleven charges Lettsome with first degree arson, in
violation of Title 14, Section 252 of the Virgin Islands Code. In
the Virgin Islands, arson is "the willful and malicious burning of
a building of another with intent to destroy it . . . ." V.I. CODE
ANN. tit. 14, § 251. First degree arson is the "malicious[] burn[ing]
in the night time [of] an inhabited building in which there is at
the time some human being . . . ." V.I. CODE ANN. tit. 14, § 252(a).
Count Twelve charges that Lettsome used a dangerous weapon during
the commission of the arson.

*Lettsome v. People*
Crim. App. No. 2006-68
Memorandum Opinion
Page 35

Again, the evidence adduced at trial consisted primarily of Lettsome's statement that he set Geiger's house on fire in order to cover up his crime. This statement was corroborated by the fact that Geiger's house was found to be on fire by some of Geiger's tenants, who also rescued Nathan Geiger from the blaze. Lettsome also stated that he honked a car horn to alert tenants to the fire, and several tenants recalled hearing a car horn shortly before they became aware of the fire. From this evidence, a jury could reasonably conclude that set fire to Geiger's house at night, while people were inside of it, and that Lettsome did so with the intent of destroying it.

However, there was no evidence adduced at trial that at any point during the commission of the arson Lettsome used, possessed, carried, bore, transported, or otherwise maintained in his proximate control any dangerous weapon whatsoever. While Lettsome did confess to using a metal pipe and a knife to attack David and Nathan Geiger, nothing in his confessions indicated that he continued to carry such weapons with him while he set Geiger's house on fire. There was likewise no circumstantial or other basis from which a jury could reasonably infer that Lettsome was armed and dangerous during the time he was setting the house alight. Accordingly, we will reverse Lettsome's conviction on this count and remand the case to the trial court with instructions to enter a judgment of not guilty as to Count Twelve.

*Lettsome v. People*
Crim. App. No. 2006-68
Memorandum Opinion
Page 36

## E.   Amending the Information

On the morning of jury selection, the trial court advised the parties that, in Counts Two, Four, Six, Eight, Ten, and Twelve—the Counts charging Lettsome with use of a dangerous weapon--the Information omitted the essential element of the weapon being used during the commission of a crime of violence. The trial court further noted that none of the Counts in the Information recited that the conduct charged was unlawful. (J.A. 551.) However, the Information did cite to Title 14, Section 2251(a)(2)(B). Over the defense counsel's objection, the trial court permitted the People to amend the information.

An information may be amended "any time before the verdict or finding" unless "an additional or different offense is charged or a substantial right of the defendant is prejudiced." Fed. R. Crim. P. 7(3). "An information may appropriately be amended to charge a lesser included offense of the offense initially charged, provided substantial rights of the defendant are not prejudiced." *Government of the Virgin Islands v. Bedford*, 671 F.2d 758 (3d Cir. 1982). A lesser included offense is one that does not require any proof of any additional element beyond those required by the greater offense. *See Brown v. Ohio*, 432 U.S. 161, 164-69 (1977). Here, however, the People amended the Information to include additional elements, and thus we cannot say the amendment was akin to including a charge for a lesser included offense.

*Lettsome v. People*
Crim. App. No. 2006-68
Memorandum Opinion
Page 37

However, our inquiry does not end there. In *Government of the Virgin Islands v. Bedford*, 671 F.2d 758 (3d Cir. 1982), the Court of Appeals for the Third Circuit upheld the amending of an information to include a charge assault with a deadly weapon when the original information charged only assault with intent to rob. The Court noted first that the "detailed and particular language used in [the information] . . . not only contained all the elements necessary to charge assault with intent to rob, but also all the elements of assault with a deadly weapon." *Id.* at 765. Further, the court noted that the defendant could not claim surprise because the "[d]efendant had adequate notice of the charge" and the defense consisted of "a complete denial of all the allegations . . . ." *Id.* at 766.

Here, although the Information omitted an essential element from each of the six weapons charges, the charges cited most of the elements and referenced the appropriate statutory provision. This should have given Lettsome ample notice of the crimes with which he was being charged. Moreover, as in *Bedford*, Lettsome's defense consisted primarily of a complete denial of all charges, on the grounds that his confessions were fabricated, and thus it is "not clear how [the] defendant would have changed his defense in any way" had the original Information been properly pleaded.

**F.   Excessive Sentence**

Finally, Lettsome contends that his sentence in excess of fifty-seven years was disproportionate to the crimes of second degree

murder, attempted second degree murder, and first degree arson.
Lettsome does not suggest that there was any procedural error;
rather, he argues that the trial court violated the Eighth Amendment
by sentencing him to consecutive terms on several counts.

A sentence is reversed for an Eighth Amendment violation only
in the rare case "where the challenged sentence is so unconventional
or extreme in comparison to the severity of the crime as to create
an initial presumption of excessiveness." *Salaz v. Government of
Virgin Islands,* 2007 WL 2138672, 6 -7 (D.V.I. 2007). The Eighth
Amendment specifically states that "excessive bail should not be
required nor excessive fines imposed, nor cruel and unusual
punishments inflicted." U.S. Const. amend. VIII. Usually a reviewing
court will defer to the legislature's lawmaking function and will
not disturb a sentence that is within the terms prescribed by the
legislature absent a showing of improper procedure, illegality, or
abuse of discretion. *Salaz* at 7. Although Lettsome argues that his
sentence is disproportionate, his sentence is within the prescribed
maximum terms set by the Virgin Islands legislature for second degree
murder, attempted second degree murder, and arson. Further, in its
order announcing the sentence, the trial court considered the
seriousness of the crime. The trial court considered the vicious
method of beating, stabbing, and strangulation used to kill David
Geiger. The trial court also considered the near-death beating of
Nathan Geiger, a fourteen-year-old boy at the time of the attack,

which required multiple reconstructive surgeries, and traumatic brain surgery. Additionally, the trial court considered that the Lettsome set the house on fire, endangering other occupants, with the sole intent of covering up his other crimes. The trial court also noted that the Appellant stole a boat to flee the jurisdiction, cut his hair, and wore disguises while he hid in Tortola. (J.A. 558.) Given the circumstances surrounding the crimes, the nature of the crimes themselves, and Lettsome's subsequent behavior, we cannot say that the sentence pronounced by the trial court violated the Eighth Amendment.

## IV. CONCLUSION

For the reasons discussed above, we will affirm Lettsome's conviction as to Counts Three, Four, Five, Six, Nine, Ten, and Eleven. The Court will reverse Lettsome's conviction on Count Twelve, and remand for entry of a judgment of not guilty on that Count.  An appropriate judgment follows.